NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

**07-0424**


ANNIE MAE NUNEZ

VERSUS

MICHAEL TRIBE, ET AL.


************

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT,
PARISH OF VERMILION, NO. 79144-B
HONORABLE JULES EDWARDS, III, DISTRICT JUDGE

************

**JIMMIE C. PETERS
JUDGE**

************

Court composed of John D. Saunders, Jimmie C. Peters, and Glenn B. Gremillion, Judges.


**AFFIRMED.**



**Sue Fontenot**
**Attorney at Law**
**400 South State Street**
**Abbeville, LA 70510**
**(337) 893-8104**
**ATTORNEY FOR PLAINTIFF/APPELLANT:**
    **Annie Mae Nunez**

**Susan A. Daigle**
**Tonya R. Smith**
**Daigle, Jamison & Rayburn**, **L.L.C**.
**303 W. Vermilion Street, Suite 210**
**Lafayette, LA 70502**
**(337) 234-7000**
**ATTORNEYS FOR SECONDARY DEFENDANTS/APPELLANTS:**
    **Michael I. Tribe, Et Al.**

PETERS, J.

This litigation arises from a two-vehicle automobile accident which occurred in Vermilion Parish, Louisiana, on November 19, 2002. Annie Nunez, the driver of one of the vehicles involved in the accident, filed suit against a number of defendants.[1] By the time the matter went to trial on January 17, 2006, only Michael I. Tribe, Traco Production Services, Inc. (Traco Production), and Steadfast Insurance Company (Steadfast Insurance) remained as defendants. Mr. Tribe was the driver of the other vehicle involved in the accident, Traco Production was his employer, and Steadfast Insurance was Traco Production's excess liability insurer.

A jury rendered a judgment in Ms. Nunez's favor, and against the three defendants, in the amount of $1,075,050.00. Because Ms. Nunez had settled with Traco Production's primary liability insurer prior to trial, the trial court reduced the jury award by $1,000,000.00—that insurer's policy limits. After the trial court executed a judgment awarding her $75,050.00, Ms. Nunez appealed, and the defendants answered the appeal. In her appeal, Ms. Nunez raises two assignments of error, while, in their answer, the defendants raise three assignments of error.

For the following reasons, we affirm the trial court judgment in all respects.

### DISCUSSION OF THE RECORD

Liability at trial was not at issue. By a partial summary judgment, the trial court had previously concluded that the sole cause of the accident was Mr. Tribe's negligence, that he was in the course and scope of his employment with Traco Production at the time of the accident, and that Traco Production was liable for Mr. Tribe's negligence based on the doctrine of *respondeat superior*. Considering the damage issue, the jury itemized Ms. Nunez's damages as follows:

---

[1]Another plaintiff had joined Ms. Nunez in the original suit, but before trial the trial court granted an exception of no right of action dismissing him from the litigation.

| | |
|---|---|
| 1. Past, Present & Future Physical & Mental Pain & Suffering | $500,000.00 |
| 2. Loss of Enjoyment of Life | $100,000.00 |
| 3. Disability | $100,000.00 |
| 4. Past Loss of Wages | $ 40,000.00 |
| 5. Future Loss of Earnings/Earning Capacity | $175,000.00 |
| 6. Past Medical Expenses | $101,050.00 |
| 7. Future Medical Expenses | $ 50,000.00 |
| 8. Home Alterations | $ 9,000.00 |

On April 24, 2006, the trial court executed a judgment awarding Ms. Nunez a total recovery of $75,050.00 against the three defendants. The judgment also awarded her legal interest from January 6, 2003—the date of judicial demand. Additionally, although it cast the three defendants with all court costs, it awarded interest on the court costs only from the date of judgment.

In the first of her two assignments of error, Ms. Nunez asserts that the trial court erred in only awarding legal interest on the amount of judgment and not on the entire jury verdict. In her second assignment of error, she seeks an increase in the award for loss of enjoyment of life.

In the first of the three assignments raised in their answer to the appeal, the defendants seek a reduction in the jury's general damage awards. Their second assignment of error addresses the trial court's refusal to allow them to introduce surveillance tapes of Ms. Nunez. Finally, in their third assignment of error, the defendants assert that the trial court erred in excluding evidence regarding benefits to which Ms. Nunez might be entitled under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654 (2004) and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213 (2004).

2

**OPINION**

*Ms. Nunez's Assignment of Error No. 1*

On December 10, 2004, Ms. Nunez filed a pleading entitled "**MOTION AND ORDER OF PARTIAL DISMISSAL**," wherein she sought dismissal of Traco Production's primary liability insurer, Trinity Universal Insurance Company (Trinity Universal), as a party defendant.  In the pleading, Ms. Nunez represented to the trial court that she had settled with Trinity Universal for an amount which the settling parties had agreed was to be considered tantamount to full payment and full exhaustion of the $1,000,000.00 underlying and primary limits of Trinity Universal's policy.  By the pleading, Ms. Nunez specifically asserted that she sought to

> dismiss the Defendants, MICHAEL I. TRIBE, TRACO PRODUCTION SERVICES, INC. and TRINITY UNIVERSAL INSURANCE COMPANY, with prejudice, but only up to and including the underlying and primary limits as contained in the applicable Trinity Universal Insurance Company insurance policy, *including legal interest on those underlying and primary limits*, ONLY, as applicable, reserving her rights against Defendants, MICHAEL I. TRIBE, TRACO PRODUCTION SERVICES, INC. AND STEADFAST INSURANCE COMPANY, for any amount over, above and in excess of the aforesaid primary and underlying limits of liability of the TRINITY UNIVERSAL INSURANCE COMPANY policy, which are ONE MILLION AND NO/100 ($1,000,000.00) DOLLARS, including interest on said underlying and primary limits, only, if applicable;

(emphasis added).

On December 14, 2004, the trial court executed the order made a part of the pleading.  That order reads as follows:

> THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the above numbered and entitled suit be and the same is hereby dismissed with full prejudice to the rights of the Plaintiff, ANNIE NUNEZ, against Defendants, MICHAEL I. TRIBE, TRACO PRODUCTION SERVICES, INC. and TRINITY UNIVERSAL INSURANCE COMPANY, only up to and including the underlying and primary policy limits of Trinity Universal Insurance Company of ONE MILLION AND NO/100 ($1,000,000.00) DOLLARS, *plus legal interest*

3

*on those primary and underlying limits*, only, as applicable, and reserving any and all rights of the Plaintiff, ANNIE NUNEZ, against the Defendants, MICHAEL I. TRIBE, TRACO PRODUCTION SERVICES, INC. and STEADFAST INSURANCE COMPANY, with respect to any and all of Plaintiff's claims above, beyond and in excess of the aforesaid underlying and primary limits of Trinity Universal Insurance Company, including legal interest on those underlying and primary limits, only, as applicable;

IT IS HEREBY FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff, ANNIE NUNEZ, reserves all of her rights against Defendant, STEADFAST INSURANCE COMPANY, insofar as the excess and umbrella liability insurance policy issued by STEADFAST INSURANCE COMPANY to TRACO PRODUCTION SERVICES, INC. and applicable to matters involved in this litigation;

IT IS HEREBY FURTHER ORDERED, ADJUDGED AND DECREED that all parties are responsible for payment of their own Court costs which they have incurred in this matter;

(emphasis added).

The jury returned its decision on February 10, 2006. On February 21, 2006, Ms. Nunez filed a pleading entitled "**RULE TO TAX COSTS**" wherein she sought, in addition to a fixing of costs, a ruling that she was entitled "to legal interest on **all amounts recovered** from date of judicial demand until paid," including interest on costs. (Emphasis in original.) After a hearing on the rule, the trial court concluded that Ms. Nunez could collect pre-judgment interest only on $75,050.00—the amount of the award in excess of the underlying primary coverage.

In reaching that conclusion, the trial court found that Ms. Nunez's December 10, 2004 motion and the order executed in response to that motion did not reserve any right against Steadfast Insurance that would require it to pay interest on the settlement amount paid by Trinity Insurance. Observing that in both the motion and the order to dismiss the primary insurer the phrase "including legal interest on those underlying and primary limits" modified the phrase "the aforesaid underlying [and] primary

4

limits" and not the word "excess," the trial court noted that the right to interest against the excess carrier was not even reserved. That is to say, Ms. Nunez's right to the underlying and primary policy limits together with legal interest on that amount was the subject of the dismissal with prejudice as to Trinity Universal; and her right to claims above and beyond the underlying and primary policy limits, including interest, was what she reserved as to Steadfast Insurance.[2]

We agree with the trial court's analysis. Both the dismissal of rights and the reservation of rights were consistent with Louisiana law and the insurance policies involved in this case. Ms. Nunez reserved all rights she legally could reserve against Steadfast Insurance, but could not reserve rights she did not have. Thus, she could not recover interest from Steadfast Insurance for an obligation Trinity Universal owed: the first $1,000,000.00 in damages.

Louisiana Revised Statute 13:4203 provides that legal interest shall attach from date of judicial demand on all judgments sounding in damages "ex delicto." It further "imposes the requirement that all liability insurers are liable for interest on their policy limits from the date of judicial demand." *LeBlanc v. Aysenne*, 05-297, p. 6 (La. 1/19/06), 921 So.2d 85, 91. The jurisprudential rule requiring insurers to pay judicial interest from judicial demand applies to primary as well as excess insurers and each insurer is liable for the interest attributable to its proportionate share of the total

---

[2]Ms. Nunez's arguments regarding the claimed reservation of rights is not based on the settlement documents with Trinity Universal (to which Steadfast Insurance was not a party). It is based on the language of her December 14, 2004 unilateral motion to dismiss Trinity Universal and the trial court's judgment of dismissal. Both the settlement and the judgment of dismissal occurred over a year before the case went to trial against the excess insurer. "In construing a judgment, the entire context must be considered, and in the event of doubt or ambiguity it is proper to consider the pleadings, subject matter of the suit, reasons for judgment, and other matters of record in order to arrive at an interpretation consistent with a proper decree on the facts and law presented." *Veal v. Am. Maint. & Repair, Inc.*, 00-2245, pp. 4-5 (La.App. 1 Cir. 12/28/01), 804 So.2d 889, 891 (citations omitted). We perceive nothing doubtful or ambiguous about the language of that dismissal.

judgment. *Toston v. Nat'l Union Fire Ins. Co. of La.*, 41,567 (La.App. 2 Cir. 11/3/06), 942 So.2d 1204, *writ denied*, 06-2881 (La. 2/2/07), 948 So.2d 1086. In the present case the primary insurer, Trinity Universal, would have been liable for legal interest on any judgment up to its limits of $1,000,000.00. While La.R.S. 13:4203 requires liability insurers to pay legal interest on judgments within their policy limits from the date of judicial demand, Louisiana jurisprudence also allows insurers to reduce, exclude, or extend their interest liability on excess judgments. To determine an insurer's interest obligation on an excess judgment, we must refer to the supplemental payment provisions contained in the applicable policy. *Martin v. Champion Ins. Co.*, 95-30 (La. 6/30/95), 656 So.2d 991. The supplemental payment provisions of the Steadfast Insurance policy, which is in the record, clearly makes it liable for pre-judgment interest only on the part of the judgment for which it becomes obligated to pay—in this case, $75,050.00.[3]

Ms. Nunez's settlement with, and dismissal of, Trinity Universal included settlement of the interest owed on that policy's contribution to the settlement. Therefore, she could not reserve a right to claim payment by Steadfast Insurance of interest that may have been owed by Trinity Universal. For these reasons we find no merit to Ms. Nunez's first assignment of error.

---

[3]In her rebuttal brief on appeal Ms. Nunez raises for the first time the argument that an excess insurer's obligation to pay judicial interest on the primary insurer's obligation is a coverage defense which in this case Steadfast Insurance waived its right to assert. She also raised for the first time the additional contention that Steadfast Insurance cannot now be heard to contest its liability for interest on the primary coverage because it did not plead non-coverage as an affirmative defense. We have not addressed either of these arguments primarily for the reason that the plaintiff never pled Steadfast Insurance's liability for interest on the primary limits. Also, Steadfast Insurance never denied coverage as an excess insurer.

6

***Ms. Nunez's Assignment of Error No. 2***
***and Steadfast Insurance's Assignment of Error No. 1***

In her second assignment of error, Ms. Nunez asserts that the $100,000.00 jury award for loss of enjoyment of life is inadequate. In its first assignment of error, Steadfast Insurance asserts that the $700,000.00 general damage award is excessive.

In considering whether an award of general damages is excessive or inadequate, we are guided by the decision in *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994), wherein the supreme court noted that "the discretion vested in the trier of fact is 'great,' and even vast, so that an appellate court should rarely disturb an award of general damages." Under *Youn*, "[t]he initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the 'much discretion' of the trier of fact." *Id.* at 1260. Only after the initial inquiry is answered in the affirmative should the appellate court increase or reduce the award. *Id.* In making the initial inquiry, the reviewing court should not use "a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case." *Id.* Such prior awards should be considered only after the reviewing court concludes that there has been an abuse of discretion. *Id.*

It is clear from the record that Ms. Nunez's injuries are devastating and life-altering. In the accident she sustained major injuries to both feet and ankles which resulted in permanent disabilities to her body. Her orthopedic injuries required a number of hospitalizations and surgeries, which resulted in arthritis, continuing pain, and disability. Additionally, her lower back became symptomatic and she developed

lingering knee and shoulder difficulties. Treatment of her pain required extensive physical therapy, a home exercise and treatment regimen, and chiropractic care. As a result of the injuries sustained, she developed a permanent abnormal gait and a limp. For five months following her initial hospitalization at Our Lady of Lourdes Hospital in Lafayette, Ms. Nunez was confined to a wheelchair, and relied on a wheelchair and crutches for several months after that.

Dr. Christopher Hebert, an orthopedic surgeon with a sub-specialty in foot and ankle injuries, performed five surgeries on Ms. Nunez in attempt to repair her fractured ankle and foot bones. He suggested that three more surgical procedures would eventually be necessary as her pain became more intense. According to Dr. Hebert, the surgeries would entail fusions which needed to be delayed as long as possible because, if not, the pain reduction benefits of the fusion procedures would be countered by other orthopedic problems. Approximately two years after the accident Dr. Hebert put Ms. Nunez in a brace to hold her feet and ankles together.

The medical evidence verified Ms. Nunez's testimony describing her severe chronic and disabling pain, its permanence, and the fact that she had reached maximum improvement. Dr. Hebert described her mobility as very restricted, and her pain as chronic. For the first two years following her initial surgery she took pain medication, including morphine. However, upon the advice of Dr. Hebert she did her best to endure the pain without extra medication.[4]

Dr. Michael Heard, another orthopedic surgeon who treated Ms. Nunez, testified that she had a severe right limp and radiculitis in the lumbar spine with pain going

---

[4]Dr. Hebert testified he was professionally opposed to extensive treating with habit-forming pain medication, and that Ms. Nunez accepted that idea, preferring to endure the pain over the risk of drug dependence.

8

down into the leg. He also saw effusion in the left knee and left shoulder arthrosis. His prognosis was pain on a permanent basis.

The evidence established that Ms. Nunez had not had any previous health problems before the accident and was almost never pain free after the accident. She described her daily regimen of turbulating her feet, doing stretches of her back as prescribed by her therapist, and exercising her upper body. She was also under the treatment of a chiropractor, Dr. Jennie Perry, and was obtaining some relief from that source. Dr. Perry testified that Ms. Nunez suffered from severe spasms in the low back and that this condition was severe and chronic.

From the 1980's until the accident Ms. Nunez worked as an employee of Luhr Brothers, Inc. at its Lafayette, Louisiana limestone yard. Despite her small physical build, she operated heavy moving equipment in the yard and otherwise ran the yard operation. The injuries she sustained in the accident will preclude her from ever performing that type of work again. Before the accident she had worked her way to the position of office manager and was still employed at the time of trial. However, the jury evidently took into account the uncertainty of her continued employment and believed that her future earning capacity was reduced as reflected in its award for loss of earnings/earning capacity. The testimony supports this loss. In fact, her treating physicians limited her future duties to nothing more demanding than light, sedentary work.

Ms. Nunez testified that her main loss from her injuries was in her lifestyle. She was a lifelong lover of horses, and at the age of six she had begun competing in barrel-racing. At ten she was a jockey on the bush tracks. She trained horses and taught her grandchild to ride and barrel-race. Prior to the accident she was actively

9

training horses and barrel-racing, describing horses in her life as a "passion." In fact, she wanted to pursue the development of a racehorse bloodline. However, she testified that her permanent physical condition after the accident precluded her pursuit of this goal.

Based on the testimony and evidence presented by the plaintiff, the jury could well have concluded that Ms. Nunez's prognosis was grim and that she would continue to suffer substantial pain, limitations and restrictions of motion, and general inability to use her feet. We have studied carefully the arguments of both sides in support of their respective appeals urging an abuse of discretion in the general damages awards, and if we had made the determination, we might have reached a different result. However, considering the vast discretion in the trier of fact, as established by *Youn* and its progeny, and considering the effect of the particular injuries to this particular plaintiff under these particular circumstances, we do not find an abuse of discretion in any of these awards.

### *Steadfast Insurance's Assignment of Error No. 2*

On both February 22, 2005, and May 9, 2005, the trial court heard and denied a motion in limine filed by Ms. Nunez wherein she attempted to exclude certain surveillance videos of her activities after the accident. Near the end of the trial on the merits, and while Ms. Nunez was testifying under cross-examination, the defendants offered four surveillance video tapes. The trial court ruled that the tapes were inadmissible.

After the trial court's ruling, the defendants requested that the trial court reconsider its decision and informed the trial court that it would later cue up scenes from the tapes that would support admissibility. This was never done. The next day,

10

and after the jury had retired to deliberate, the defendants offered the video tapes as a proffer. In arguing that the trial court erred in refusing to admit the surveillance tapes, the defendants rely on a short colloquy in open court summarizing a discussion in chambers concerning the tapes. The colloquy is a part of the appellate record. The chambers discussion is not. Our assessment of the trial court's action in this matter is hampered by the fact that much of the discussion relating to the videotapes' content and the purpose for offering them took place in chambers.

The record does imply that the chambers proceedings included some discussion relating to the offer of the tapes as being for substantive purposes, as the trial court immediately acknowledged that fact upon assuming the bench after the recess wherein the discussion occurred. The trial court specifically stated that it understood the law to be that surveillance evidence is only to be admitted for impeachment purposes, and added that "I have not heard as yet what is to be impeached by the tapes." After the trial court made this statement, the defendants retreated from their position that the surveillance evidence could be admitted for substantive purposes and took the position that the evidence did in fact contain impeachment material. In arguing this position, the defendants directed the trial court to Ms. Nunez's testimony that she was never absolutely pain free, that she rarely wore her brace against the skin, that she had difficulty walking without a brace, and that she had difficulties driving her Nissan truck. In doing so, they suggested that the videotape would show otherwise. The trial court responded that it did not recall certain aspects of the evidence to be as suggested by the defendants and questioned whether the duration of the filming supported the defendants' position. The trial court obviously opined that the acts captured on the

11

videotapes were not inconsistent with prior testimony and, therefore, the videotape was inadmissible as impeachment evidence.

When the defendants' counsel pursued the argument even after the ruling, the trial court stated that "I'm not persuaded.  My ruling stands."  Nevertheless, the on-the-record colloquy continued with one counsel for the defendants stating,

> And I understand the Court's - - now, the one additionally [sic] thing I would request is that at some point the Court have a viewing, at least in camera, of the video to make a determination of whether it's impeachment or not.  And I don't know if you have to do that right this instant, but - -

At this point the other defense counsel interrupted, saying, "I'm going to ask additional questions on the impeachment issue."

Whereupon, the other defense counsel added,

> Well, let's see if we can lay the foundation elsewhere, Your Honor, before we go that route, but I think at some point before the end of the trial, that's going to have to be done.  And I'm not going to have the Court view everything.  I'll have everything cued up and show you the stuff that I think is pertinent.

This marked the last mention of the surveillance tapes before they were proffered after the jury retired to deliberate its verdict.  Nothing in the record suggests that the trial court was ever shown the pertinent film or asked or given the opportunity to reconsider its ruling.  The statements by defense counsel made *after* the trial court announced the ruling rejecting the evidence can only be interpreted as a request that the matter be left open for the defendants to pursue further when they began to present their case.  Additionally, there is no suggestion that the trial court would not have entertained such a reasonable request when the defendants began to present their case.

"The determination of whether motion pictures or videotapes are admissible is largely within the discretion of the trial court."  *Olivier v. LeJeune*, 95-53, p. 10 (La.

12

2/28/96), 668 So.2d 347, 351 (quoting *Lafleur v. John Deere Co.*, 491 So.2d 624, 632 (La.1986)). The defendants argue, however, that the trial court's action was an error of law, not one of discretion.[5] In their brief to this court, the defendants ask that we "admit into evidence the surveillance videos proffered during trial and reduce the general damages award after conducting a de novo review in light of the trial court's error." Because the trial court never viewed the videotapes during the chambers discussion and was never asked to look at them later, we are being asked to do what the trial court was never given the opportunity to do. We are compelled to conclude that the defendants simply abandoned any further pursuit of introduction of the tapes for any purpose. Our courts have enunciated the rule that "issues not submitted to the trial court for decision will not be considered by the appellate court on appeal." *Cerwonka v. Baker*, 06-856, p. 8 (La.App. 3 Cir. 11/2/06), 942 So.2d 747, 753 (quoting *State v. Williams*, 02-898, 02-1030, p. 7 (La. 10/15/02), 830 So.2d 984, 988). Thus, there is nothing for us to review regarding this assignment.

### *Steadfast's Assignment of Error No. 3*

Pursuant to a motion in limine filed by Ms. Nunez, the trial court concluded that any benefits she received under the provisions of the FDMA and ADA would be subject to the collateral source rule, for which the defendants would not be entitled to a credit. Thus, the trial court concluded, the defendants could not mention to the jury any potential causes of action Ms. Nunez might have under these federal statutes. By

---

[5]Their argument that the use of surveillance videotape is not limited to impeachment evidence is based on language from *Wolford v. JoEllen Smith Psychiatric Hosp.*, 96-2460 (La. 5/20/97), 693 So.2d 1164. The ruling in that case was a "narrow one addressing the timing of the production of surveillance videotape during the course of pretrial discovery." *Id.* at 1166. In the course of deciding that issue and while discussing La.Civ. Code art. 1422 dealing with the scope of discovery, the court in *Wolford* said that "[s]uch surveillance videotape could be used as substantive, corroborative, or impeachment evidence at trial." *Id.* at 1166.

their third assignment of error, the defendants assert the trial court abused its discretion in so ruling.

The defendants sought review of this ruling by an application for supervisory writs to this court. In an unpublished opinion, this court denied that application. *Nunez v. Tribe*, 05-631 (La.App. 3 Cir. 10/31/05). The Louisiana Supreme Court then denied the defendants' application for a writ of certiorari from our ruling. *Nunez v. Tribe*, 05-2502 (La. 1/9/06), 918 So.2d 1058. The arguments presented to us in this appeal are the same as those submitted to the trial court initially, and those submitted to this court in the original application for supervisory writs.

> The law of the case doctrine provides that "an appellate court ordinarily will not reconsider its own rulings of law in the same case;" it applies to prior rulings of the appellate court and/or supreme court in the same case. This doctrine applies to parties who were in the litigation at the time of the prior ruling and had their day in court. The purposes of the doctrine are to avoid litigating the same issue again and to promote consistency of result within the case, essential fairness to the parties, and judicial efficiency. The "law of the case" is discretionary; it is not applicable to cases in which "the prior decision was palpably erroneous or its application would result in manifest injustice."

*Ledoux v. Grand Casino-Coushatta*, 06-1500, p. 15 (La.App. 3 Cir. 4/4/07), 954 So.2d 902, 905 n.3 (quoting *Estate of Patout v. City of New Iberia*, 01-151, p. 7 (La.App. 3 Cir. 6/27/01), 791 So.2d 741, 747), *writ denied*, 07-954 (La. 6/22/07), 959 So.2d 507.

Finding that the law of the case doctrine applies, we will not revisit this issue.

## DISPOSITION

For the foregoing reasons, we affirm the judgment of the trial court in all respects. We assess one half of the costs of this appeal to the plaintiff, Annie Nunez, and one half of the costs of this appeal to the defendants, Michael I. Tribe; Traco Production Services, Inc.; and Steadfast Insurance Company.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.  Rule 2-16.3, Uniform Rules, Courts of Appeal.